NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FAIRVIEW RITZ CORPORATION d/b/a FAIRVIEW FITNESS CENTER/RITZ DAY SPA, <br><br> Plaintiff, <br><br> v. <br><br> BOROUGH OF FAIRVIEW, BOROUGH OF FAIRVIEW POLICE DEPARTMENT, ANTHONY ANARI, JR., et al., <br><br> Defendants. | Civil Action No. 9-875 (JLL) <br><br> **OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of Defendants Borough of Fairview ("Borough"), Borough of Fairview Police Department ("Police Department"), and Lieutenant Anthony F. Anari, Jr.'s ("Lt. Anari") (collectively "Defendants") motion for summary judgment and Plaintiff Fairview Ritz Corporation's ("Plaintiff") motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to Defendants' and Plaintiff's motions, and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion is granted in part and denied in part and Plaintiff's motion is denied.

## I. BACKGROUND

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that police, on several occasions, unconstitutionally searched its business–a fitness center and day spa–on suspicion of

prostitution activities, and unlawfully revoked its business license. (Compl. ¶ 15.) Plaintiff alleges that Defendants unlawfully targeted its business as being a cover for prostitution. (*Id.* at ¶ 22.) Plaintiff further alleges that as a result of Defendants' actions, Plaintiff was forced to shut down the business, which has not reopened. (*Id.* at ¶¶ 22, 24.) The Complaint, filed on February 25, 2009, asserts claims for damages against all Defendants for (1) wrongful search and seizure under the New Jersey Civil Rights Act; (2) state law torts of trespass and invasion of privacy; (4) Fourth and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983, namely (a) wrongful search and seizure; (b) trespass and invasion of privacy; and (c) denial of due process. On January 14, 2011, Plaintiff voluntarily dismissed with prejudice the Third Count of the Complaint in which it alleged that Fairview Ordinance 4-17.1, which was passed in October 2003 and requires massage operators to be licensed, was unconstitutional facially and as applied to Plaintiff. (CM/ECF No. 20.)

On September 13, 2013, Plaintiff moved for summary judgment on its Fourth Amendment claims arising out of a January 17, 2008 search by Lt. Anari and members of the Fort Lee department of its premises and seizure of its property. (CM/ECF No. 81.) Defendants moved for summary judgment as to all claims asserted in the Complaint. (CM/ECF No. 85.)

a. Fairview Ritz Corporation

Plaintiff is a New Jersey corporation licensed by the Borough under its Ordinances to conduct business at Vanick Plaza in Fairview, New Jersey under the name of "The Ritz Day Spa," and has been in operation since March 27, 2000. (Def. Statement of Undisputed Material Facts ("SUMF") at ¶ 1.) Joseph Urgo ("Urgo') is the President of Fairview Ritz. (*Id.* at ¶ 2.) Urgo was unable to produce a lease for occupancy of the commercial premises at Vanick Plaza in his name or in the name of Fairview Ritz. (*Id.* at ¶ 3.) Ron Stone was Plaintiff's "business

2

and advertising consultant" who had maintained an office at The Ritz, and acted as a third-party liaison between Plaintiff and its attorneys Scott Finckenauer, Esq. and Dennis Oury, Esq. (*Id.* at ¶ 17.)

The business certificate issued by the Borough to The Ritz Day Spa on March 27, 2000 stated that the Ritz would provide "holistic services," including aromatherapy, magnetic therapy, and massage therapy. (*Id.* at ¶ 4.) Urgo worked primarily from home and another office in Mount Vernon, New Jersey and was not involved in the daily operations of The Ritz Spa. (*Id.* at ¶ 5.) He did not know whether massages or other "holistic services" were being performed at all times on the premises of the spa by its employees. (*Id.* at ¶ 6.)

The Borough Ordinances in effect in 2000 required a business to obtain a new certificate of occupancy from the Borough if its owner or the nature of its business changed. (*Id.* at ¶ 7.) The Ordinance required the business to obtain a new certificate for each new type of business it conducted. (*Id.*) The business would not be eligible for a certificate "unless the condition of the [dwelling unit] complie[d] with all statutes of the State of New Jersey, [and] the rules and regulations issued thereunder...." (Def. SUMF Exhibit B, Ord. No. 11.44.)

At his deposition, Urgo recalled operating the following businesses out of the commercial premises at Vanick Plaza: The Ritz Day Spa, No Name Club, and Amanda's Tickets. (*Id.* at ¶ 9.) Urgo stated that he did not recall a business by the name of Fairview Fitness Center, when Fairview Fitness Center began operating out of the premises associated with The Ritz, or if he had ever obtained a business certificate for Fairview Fitness Center. (Def. SUMF Exhibit C, Urgo Dep. 83:9-15, 104:8-22, 145:17-146:4; Def. SUMF Exhibit D, Urgo Dep. 176:1-12.)

Amanda's Tickets was a resale ticket business. (*Id.* at ¶ 13.) No Name Club was a bachelor party service that operated out of the premises of The Ritz Day Spa and allowed patrons to hire

dancers, who would perform on a stage and using a pole located in the middle of the room, and play pool. (*Id.* at ¶ 14.) Both of these activities took place on the premises registered to The Ritz Day Spa. (*Id.*) Urgo could not recall obtaining business occupancy certificates for Amanda's Tickets or the No Name Club. (Def. SUMF Exhibit C, Urgo Dep. 38;11-21, 44:19-21, 47:5-8, 50:5-18, 53:7-54:5, 55:15-17, 134:25-135:12, 151:14-153:12.) On March 2, 2005, Plaintiff applied for a new business certificate for The Ritz Spa to expand its massage services to include hydrotherapy, personal training, and athletic training, but made no mention of Amanda's Tickets or the No Name Club in its application. (*Id.* at ¶ 16.)

From 2001 through 2006, police made several arrests for solicitation and promotion of prostitution at The Ritz Spa. (*Id.* at ¶ 18.) On three of these occasions, August 8, 2001, September 27, 2005, and October 4, 2006, police arrested Ron Stone, Plaintiff's business consultant, for prostitution-related offenses. (*Id.*) Stone's 2005 arrest resulted in an indictment by the Grand Jury for Maintaining a House of Prostitution. (*Id.* at ¶ 19.) Stone pled guilty to a reduced charge of Maintaining a Nuisance on April 17, 2006. (*Id.*) During this time, and through at least 2007, Plaintiff continued to use Stone as a business and advertising consultant for its unlicensed "No Name Club." (*Id.* at ¶ 20.)

b.  <u>Plaintiff's Interactions with Police and the Building Department from 2002-2005</u>[1]

On September 17, 2002, after arrests for prostitution were made on the premises of the Ritz, Fairview's Construction Official, Gary Ippolito, informed Lt. Anari that the Ritz's business

---

[1] The Court notes that any incidents that occurred prior to February 25, 2007 cannot give rise to a claim under 42 U.S.C. § 1983, as they are time-barred. *See Vickers v. Childs*, 2013 U.S. App. LEXIS 13768 (3d Cir. July 3, 2013) ("[A] § 1983 claim arising in New Jersey will be time-barred if more than two years has passed since its accrual.") This Court does not consider whether such incidents can be considered as part of a "continuing violation" because Plaintiff does not address this argument. *See Larsen v. State Employee's Ret. Sys.*, 553 F. Supp. 2d 403, 417 (M.D. Pa. 2008) ("The burden is on the plaintiff to demonstrate that the continuing violations doctrine applies to toll the statute of limitations.") (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)); *see also Heilman v. T.W. Ponessa & Assoc.*, 2009 U.S. App. LEXIS 609, at *10-11 (3d Cir. 2009). The Court summarizes those facts here for background information only.

certificate had "been revoked based on the fact that the owners were running a business that was not specified on the Business Certificate." (Pl. Supp. SUMF Exhibit B.) On September 18, 2002, Plaintiff received a letter from the Fairview Building Department stating that it had been notified by the police that the Ritz had been shut down due to illegal activity. (*Id.*) "Due to this situation, the Construction Official…revoked their Business Certificate." (*Id.*)

On July 16, 2003, Lt. Anari and members of the Bergen County Prosecutors Office visited The Ritz Spa to "respond on a business in operation without a Certificate of Occupancy." (Def. SUMF Exhibit L, Fairview Police Department General Report.) Lt. Anari issued two summonses for operating without a proper certificate of occupancy and wrote in the report that Urgo, who was present on the day in question, agreed to voluntarily vacate the premises.[2] (*Id.*) Anari wrote in the police report that he requested identification from employees as they were exiting and that the prosecutors spoke with the patrons. (*Id.*) Anari stated that several patrons admitted to the prosecutors "that the women were willing to perform sexual acts for money." (*Id.*)[3] In the police report, Lt. Anari suggested that, since several arrests for prostitution had occurred at The Ritz Spa and no ordinance was in place regulating massage businesses, the Borough establish an ordinance requiring all massage therapists working out of such establishments to be licensed. (*Id.*) On September 16, 2003, the Borough enacted Ordinance 4-17 regulating the business of providing massage services and requiring all persons performing non-therapeutic massage to be licensed yearly. (Def. SUMF ¶¶ 21-22.) Employers were responsible for obtaining said licenses. (*Id.*)

---

[2] Defendants assert that Urgo voluntarily closed the premises; Plaintiff claims that the premises were shut down by Lt. Anari. (*See* Pl. Supp. SUMF ¶ 1(b); Def. Resp. to Pl. Supp. SUMF ¶ 1(b).)
[3] Plaintiff alleges in its Supplemental Response to Defendants Statement of Undisputed Facts that each of these entries by Lt. Anari, the license revocations, and the closures were illegal. (Pl. Resp. SUMF at ¶ 1.) The Court will ignore legal conclusions expressed in both parties' Rule 56.1 statements. *See* Rule 56.1(a).

On March 2, 2005, Plaintiff applied for a new business certificate for The Ritz Spa. (*Id.* at ¶ 16.) On September 27, 2005, after the arrest of Ron Stone for prostitution-related offenses, the Building Department revoked the Ritz's business certificate because the Department had been "informed that the State and County police…performed a raid on the Ritz Day Spa for possible illegal activity." (Pl. Opp. SUMF Exhibit E.) The certificate was allegedly reinstated after Plaintiff's attorney became involved and wrote the Building Department that such a "unilateral action" was "null and void." (*See* Pl. Supp. SUMF ¶ 1(c); Pl. Supp. SUMF Exhibit F.)

From March 23, 2005 through January 9, 2008, Plaintiff received four letters notifying it of its obligations under the Ordinance regarding establishments offering non-therapeutic massage. (*Id.* at ¶ 23.) Despite these letters, Plaintiff never obtained massage licenses for its employees who had been performing non-therapeutic massage.[4] (*Id.* at ¶ 24.) Plaintiff was unable to provide the names and qualifications for any of its employees who performed massage therapy at The Ritz Spa. (*Id.* at ¶ 25.) The Ritz Spa continued to offer massage services through January 17, 2008. (*Id.* at ¶ 26.)

c. Lt. Anari's July 8, 2007 Search of the Premises[5]

On January 25, 2006 and July 3, 2007, police made arrests for cocaine possession on the premises of the Ritz. (*Id.* at ¶¶ 27-28.) Upon further investigation, Lt. Anari learned that Plaintiff had been advertising the premises licensed to the Ritz as the No Name Club, a private bachelor party service, and Texas, a service whereby patrons could play poker for a fee. (*Id.* at ¶ 29.)

---

[4] Plaintiff does not deny that it failed to obtain licenses for its employees performing massage therapy as required by the Ordinance; rather, it claims that the relevant Ordinance had no legal effect on its operations. (Pl. Resp. SUMF at ¶¶ 24-26.) The Court will ignore legal conclusions expressed in both parties' Rule 56.1 Statements and interpret same as admissions in the absence of cited support in the record to the contrary. *See* Rule 56.1(a).
[5] The Court notes that it did not receive Plaintiff's exhibits I through M to its opposition to Defendant's motion for summary judgment. As such, it did not consider the content contained therein for the purposes of this motion.

On July 8, 2007, Lt. Anari visited Plaintiff's premises. (Def. SUMF ¶ 30.) Lt. Anari found the door to the business locked in violation of its Business Certificate. (*Id.* at ¶ 31.) Defendants claim that Lt. Anari then obtained the consent of Plaintiff's registered corporate agent and attorney, Scott Finckenauer, to enter the premises occupied by the Ritz and was shown around by another employee. (*Id.* at ¶ 30.) Plaintiff disputes that consent was given. (Pl. Resp. SUMF ¶ 30.) After he entered the Ritz, Lt. Anari observed two other businesses operating out of the Ritz's premises: No Name Club and Texas. (Def. SUMF ¶ 30.) Lt. Anari wrote that he then "conducted a search of the premises to ensure that everyone was out of the building and as a safety measure." (Def. SUMF Exhibit U, Narrative Report for Det. Lt. Anari.) The Building Department notified Plaintiff on July 9, 2007 that its premises were being closed because of the two unlicensed businesses and the locked front door in violation of its business license. (Def. SUMF ¶ 31.)

On July 17, 2007, Lt. Anari sent letters to several massage businesses in Fairview that had been providing massage services without a license, in violation of Ordinance 4-17. (*Id.* at ¶ 32.) Lt. Anari gave the businesses until July 30 of that year to comply with the Ordinance by submitting proof of employee certification for all employees performing massage services. (*Id.*) Plaintiff submitted no proof that it complied with this request or of having ever complied with the requirements of the Ordinance. (*Id.* at ¶ 33.)

d. Lt. Anari's July 31, 2007 Search of the Premises

On July 31, 2007, Lt. Anari visited the Ritz during normal business hours with two other officers in order to issue summonses to the business and any unlicensed employees for violations of the Ordinance. (*Id.* at ¶ 34.) Urgo was not present at the Ritz on July 31. (*Id.* at ¶ 35.) When he entered the Ritz, Lt. Anari first encountered receptionist Maria Velasquez at the front desk.

(*Id.*) Defendants claim that Lt. Anari did not enter any non-public areas of the Ritz at this point. (*Id.* at ¶ 36.) According to Lt. Anari's report, Velazquez called Daniel Swilenberg, a lawyer at the Law Offices of Dennis Oury, who said Lt. Anari could not access the spa to serve summons without a warrant. (Def. SUMF Exhibit Y, Narrative of Lt. Anari.)

Lt. Anari reached out to the Health Department and Building Department. (*Id.*) He also called the Police Department's legal advisor, Mark Thonus, for "advice on how to obtain an administrative search warrant," and Magistrate Judge Keith Roberts. (*Id.*) Thonus was unavailable. (*Id.*) Magistrate Judge Roberts said he needed further information "before he [would] rule on the request." (*Id.*) Lt. Anari then called the Borough Administrator, Diane Testa, and asked if she could locate a provision within the Borough Ordinances related to obtaining an administrative warrant. (*Id.*) Testa responded that providing testimony over the phone to Magistrate Judge Roberts along with a copy of the letter sent to massage parlors requesting compliance with the Ordinance should suffice. (*Id.*) Magistrate Judge Roberts was still hesitant to issue the warrant. (*Id.*)

While he was on the phone with the judge, the health inspector arrived at the Ritz. (*Id.*) The inspector inquired as to whether the business had a tub on the premises. (*Id.*) After confirming that it did, the inspector stated that the business had not been inspected and that she would walk through to determine if there were any violations.[6] (*Id.*) Two officers, not including Lt. Anari, accompanied the health inspector on her inspection. (*Id.*) Among the people on the premises was a handyman who was pulling copper piping in order to move the facility's soda fountain. (*Id.*) Lt. Anari wrote that this was an "obvious plumbing job in a commercial building that was being conducted by an unlicensed contractor without permits." (*Id.*) A call was placed

---

[6] In his certification, Lt. Anari claims that attorney Scott Finckenauer gave the inspector permission to conduct an inspection of the hot tubs. (Def. SUMF Exhibit V, Anari Certification at ¶ 9.)

to the Building Department to investigate. (*Id.*) At this point, Deputy Chief DelVecchio arrived at the scene. (*Id.*) The officers let several workers leave the premises without questioning. (*Id.*) The Deputy Chief advised Lt. Anari to issue the summonses to the business instead of to individual workers. (*Id.*)

The health inspector continued her compliance check. (*Id.*) The Building Department official then arrived at the scene and asked the health inspector to show him the plumbing work. (*Id.*) "After determining that there were violations of the building enforcement code[,] he red tagged the building and ordered the business shut." (*Id.*) An officer went to the Building Department to pick up the red tags and place them on the doors. (*Id.*) At this point, attorney Scott Finckenauer arrived and took the summonses. (*Id.*)

Plaintiff disputes that the Building Department shut down its premises, and claims that it was Lt. Anari who shut down the business. (Pl. Supp. SUMF ¶ 1(f).) Defendants assert that it is Lt. Anari's "understanding that the business was ordered to be closed after the Health Inspector and Construction Code Official found violations constituting a danger to public health, safety, and welfare." (Def. Resp. to Pl. Supp. SUMF ¶ 1(f).) There is also a dispute about the content of Lt. Anari's call to the judge while on the premises. Defendants claim that Lt. Anari called the judge for "advice as to whether a warrant was needed under ordinance 4-17 to issue summonses." (*Id.*) Lt. Anari's narrative report, however, supports Plaintiff's claim that Lt. Anari called the judge to obtain an administrative warrant. (Def. SUMF Exhibit Y, Narrative of Lt. Anari.)

On August 1, 2007, the Ritz was found to be open again for business by Fairview police officers. (Def. SUMF ¶ 45.) The police arrested a male patron on that day for Engaging in Prostitution. (*Id.*) Also on August 1, one female employee found on the premises gave a statement to police that she had worked for the Ritz giving massages and as a dancer for its

bachelor party services. (*Id.*) Velazquez also gave a statement to police on August 1. (Def. SUMF ¶ 46.) She stated that her duties included answering the phone and collecting a flat $80 fee for massage services. (*Id.*)

On August 12, 2007, police officers, not including Lt. Anari, again found the Ritz open for business and observed several men playing cards at one of the Ritz's poker tables. (*Id.* at ¶ 47.) The police told all parties to leave and the premises were locked. (Def. SUMF Exhibit FF, Police Report.)

### e. Lt. Anari's August 23, 2007 Search and Closure of the Premises

On August 23, 2007, Lt. Anari received a call from another officer informing him that the Ritz was again open for business. (Def. SUMF Exhibit GG, Narrative Report of Lt. Anari.) Lt. Anari and two other officers visited the Ritz and found it open for business during normal business hours. (Def. SUMF ¶ 48.) Lt. Anari's incident report states that the officers encountered Velasquez and several other females inside the premises. (*Id.* at ¶ 49.) Urgo was not present at the Ritz during this visit. (*Id.* at ¶ 54.)

Defendants claim that at no time during this visit did Lt. Anari enter any non-public portions of the premises prior to receiving consent over the phone from Steve Russo, who had been called by Velazquez and identified himself as Vice President of the Ritz. (*Id.* at ¶¶ 50-53; Def. SUMF Exhibit GG.) Plaintiff disputes that consent was given. (Pl. Opp. SUMF ¶¶ 50-53.) Defendants also claim that Russo agreed to shut down the business until any confusion surrounding the construction and fire code violations could be resolved. (Def. SUMF ¶ 52.) Plaintiffs dispute that the closure was voluntary. (Pl. Resp. SUMF ¶ 52.)

Defendants state that Russo then gave Lt. Anari consent to walk through the premises to make sure no one remained in the business after it was closed. (Def. SUMF ¶ 53.) Plaintiffs

dispute that the search was consensual. (Pl. Resp. SUMF ¶ 52.) Lt. Anari walked through the premises and found several rooms, some without working lights, occupied by a single female sitting at a table. (Def. SUMF ¶ 55.)

On November 20, 2007, Ordinance 4-17 was revised to require that additional information be submitted to the Borough in order for massage, bodywork, and somatic therapy businesses to receive annual permits. (*Id.* at ¶ 57.) The Borough sent Plaintiff a copy of the revised Ordinance and told it to comply with the new requirements. (*Id.* at ¶ 57.) On January 13, 2008, the New Jersey legislature passed a law making licensing for all persons engaged in non-therapeutic massage mandatory throughout the state. (*Id.* at ¶ 58.) Plaintiff did not provide evidence of having complied with either law. (*Id.*)

f. <u>January 17, 2008 Undercover Operation and Search of the Premises</u>

On January 17, 2008, Lt. Anari, along with detectives from the Fairview Police Department, coordinated with five detectives from the Fort Lee Police Department to conduct an undercover sting operation at the Ritz. (*Id.* at ¶ 59.) Plaintiff claims that Lt. Anari was the supervisor in control of this operation, while Defendants claim that Lt. Anari did not discuss the details of the operation with the other officers and instead acted at the direction of the Chief of Police. (*Id.* at ¶¶ 59-60.)

Wearing a wire, a Fort Lee officer posed as a customer and entered the Ritz. (*Id.* at ¶ 64.) On the surveillance video submitted in support of the instant motions, Maria Velazquez, seen at the reception desk, can be heard answering the phone and identifying the business as "Fairview Fitness Center," not "The Ritz Spa." (*Id.* at ¶ 61.) The undercover officer can be seen entering the premises, giving Velasquez money, and choosing between two women who came to the reception area. (Def. SUMF Exhibit KK.) While inside a room with a Ritz employee, the

employee offered him a sex act in exchange for money. (Def. SUMF ¶ 64.) After the four Fort Lee officers waiting outside heard the undercover officer say a pre-arranged key word over the wire, they entered the Ritz premises through the front door. (Def. SUMF Exhibit II, Narrative Report of Lt. Anari.) As they walked past the reception desk, Velazquez asked them if they were allowed to go "back there." (*Id.* at ¶ 64.) One of the officers replied, "We're the police, what you think." (*Id.*).

A few seconds later, Lt. Anari entered the reception area. Lt. Anari asked Velazquez how she was doing and passed the reception desk into the back of the premises. (*Id.* at ¶ 65.) Defendants claim that this initial entry was for the purpose of arresting the employee who propositioned the undercover officer. (*Id.* at ¶ 66.) Defendants states that this initial entry to arrest the employee who had propositioned the officer lasted approximately seven minutes. (*Id.* at ¶ 66.) The officers arrested two female employees of the Ritz pursuant to the initial entry. (*Id.* at ¶ 72.)

Defendants claim that subsequent to these arrests, the officers conducted a protective sweep of the rooms adjoining the rooms in which the employees were located. (*Id.*) The officers also opened a door to another room with a key that Velazquez provided. (*Id.*) The officers allegedly opened this room "to ensure that no other persons were hiding ready to launch an attack on the police or who were being kept against their will in any locked areas of the premises." (*Id.*) Plaintiff maintains that these actions constituted a "general search of the premises for the purpose of seizing the entire business." (Pl. Opp. SUMF ¶ 72.)

Defendants state that Lt. Anari then arrested Velazquez for maintaining a house of prostitution. (Def. SUMF ¶ 74.) Defendants claim that Lt. Anari's search of the reception desk drawer was to retrieve the $80 paid to Velasquez by the undercover and was not for the purpose

of finding evidence for the crime of maintaining a house of prostitution. (*Id.* at ¶ 75.) Plaintiffs dispute this and assert that Lt. Anari's search of the desk drawer and cash register were part of a general search "for the purpose of seizing the entire business." (Pl. Opp. SUMF ¶ 75.) Plaintiff's expert stated during his deposition that a search of the desk drawer, where Velasquez had been seated and standing prior to her arrest, subsequent to Velasquez's arrest would have been proper as a search incident to arrest. (Def. SUMF ¶ 76.)

The crux of the factual dispute between Plaintiff and Defendants surrounding the 2008 search is the scope of the search undertaken by the officers. Plaintiff claims that during the search, which lasted nearly an hour, officers broke into a locked closet and rooms that were not open to the public. (Pl. SUMF ¶ 9.) Defendants, on the other hand, deny that any officers broke open locked doors or entered areas not open to customers. (Def. SUMF ¶ 83.) Because the surveillance footage is of the reception area only, its probative value is limited. The video does not reach the back rooms of the premises, where the contested aspects of the search are alleged to have occurred.

In support of their position that the officers did not break into any locked areas of the premises, Defendants point to a blueprint of the Ritz premises. (Def. SUMF Exhibit NN, Architectural Plans for the Ritz.) Specifically, they assert that officers never broke into Ron Stone's private office, located off the reception area. (Def. SUMF at ¶ 77.) The blueprint shows that the only two offices on the premises were accessible only through a door off the reception area. (*Id.* at ¶ 77; Def. SUMF Exhibit NN, Architectural Plans for the Ritz.) Defendants claim that since the video shows that officers did not enter any door off the reception area, they could not have searched either of the two offices on the premises. (Def. SUMF ¶ 77.) Plaintiff disputes this and claims that the surveillance video shows officers seizing everything and

searching everywhere. (Pl. Opp. SUMF ¶ 77.) Plaintiff does not dispute the accuracy of the blueprint. (*Id.*)

Underlying Plaintiff's claim that the officers broke into locked areas are loud bangs heard on the surveillance footage and officers' discussions related to locked areas. The loud banging noise can be heard on the video on two occasions. (Pl. SUMF ¶ 17a-17y.) Plaintiff claims that these bangs were the noises that resulted from officers trying to break into locked areas of the premises, including a locked room and a locked costume closet. (Pl. SUMF ¶ 17.) Defendants claim that one set of bangs occurred prior to officers finding a second female employee, Jessica Srygley, naked with a male customer in a room. (Def. SUMF ¶ 78.) Defendants also claim that the bangs heard on the video were the result of officers removing a safe from its floor bolts in order to transport it to the station, where it remains unopened. (*Id.* at ¶¶ 87, 95.)[7] Lt. Anari stated while on the scene that the officers would be able to take the safe for forfeiture but "to open it, [they would] need a warrant." (*Id.* at ¶¶ 88; Def. SUMF Exhibit KK, Surveillance Video at 2:47.)

Plaintiff also points to several officers' comments that can be heard on the video, and that are allegedly related to breaking into locked areas. When the first set of banging occurs, Lt. Anari can be heard referencing the noise and saying that the officers did not need a warrant. (Def. SUMF Exhibit KK, Surveillance Video at 1:59.) At another point in the video, the officers can be heard discussing keys for one or more locked areas with the female employees. (*Id.* at 2:08.) Lt. Anari was involved in this discussion. (*Id.*) One officer can be heard saying that it was "too late," possibly referencing using a key to open something and implying that it

---

[7] Plaintiff cites Exhibit E, photographs of its premises after the search, as evidence that officers broke into locked areas. (Pl. SUMF at ¶ 9.) Defendants object to the inclusion of such photographs in the record. (Def. Opp. SUMF at ¶ 9.) The Court notes that it did not receive the photographs at issue. As such, they will not be considered for the purpose of this motion.

was "too late" because officers broke in already. (*Id.*) At another point, an officer, not Lt. Anari, can be heard asking about the costume closet and saying something about a key. (*Id.* at 2:13.) Two officers then discuss the difficulty of getting through a lock that "you could not get through with two sledge hammers." (*Id.*) It's unclear if the officer was referencing the lock on one of his closets at home, however, and not the costume closet at issue. (*Id.*)

Later in the video, Lt. Anari can be heard saying that the officers would be taking everything. (*Id.* at 2:27.) Other officers can also be heard saying they were going to "clean the joint out" and "take everything." (Pl. SUMF ¶17o-p.) Later in the video, some officers discuss a costume closet and a closet for cleaning supplies, but the rest of their statements are inaudible. (Def. SUMF Exhibit KK, Surveillance Video at 2:42.) Defendants also note that, during the search, a call came in over an officer's police radio from the officer stationed at the back entrance of the Ritz. (Def. SUMF ¶ 79.) As a result, the officer opened the parking lot, allegedly to prevent anyone else from sneaking out. (*Id.*)

After the initial entry and arrests, Lt. Anari ordered the officers to seize "money, equipment, and other property." (Def. SUMF ¶ 80.) Defendants claim Lt. Anari ordered the seizure pursuant to a directive from Mark Thonus at the Bergen County Prosecutor's Office. (*Id.*) Plaintiffs dispute this. Lt. Anari can be observed on the video talking on his cell phone and stating, "We are taking away everything, alright," and later telling another officer that they were "doing the state a favor…[and] taking everything…." But Plaintiff disputes that Lt. Anari was speaking with Thonus. (Pl. Opp. SUMF ¶ 80.) Plaintiff states that Defendants submitted no evidence, aside from the certification of Lt. Anari, of who was on the other end of the call. (*Id.*)

During the operation, the officers arrested three female employees of the Ritz, logged all items to be seized from the premises and incident to the arrests of the three employees, and

removed those items from the premises. (Def. SUMF Exhibit KK, Surveillance Video.) The seized items included computer equipment, printers, a fax machine, monitors, televisions, massage tables, a credit card machine, a DVD player, exercise machines and equipment, surround sound speakers, autographed boxing gloves, a surveillance camera, a poker table, clothing, business records, and a safe. (Pl. SUMF ¶ 13.)

g. Forfeiture Proceedings

Subsequent to the search and seizure, the Bergen County Prosecutor's Office instituted forfeiture proceedings against Plaintiff for all property taken from the premises and the individuals arrested, but not for other property taken as evidence of the crime of prostitution. (Def. SUMF ¶ 96.) Plaintiff herein (defendant/claimant in the forfeiture proceeding) did not contest the forfeiture and instead voluntarily withdrew its answer and submitted to default judgment. (*Id.* at ¶ 97.) The voluntary withdrawal stated that Fairview Fitness Center "does hereby withdraw said Answer with no liability or admission of wrong doing on the part of Claimant, [and] further waive[s] any and all claims to the return of the Defendant property and consent[s] to the entry of a Default Judgment against said Defendant property." (Def. SUMF Exhibit RR, Voluntary Withdrawal of Answer.)

## II. LEGAL STANDARD

A court shall grant summary judgment under Rule 59(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material

fact compels a trial. *Id.* at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). In making its determination, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

## III. DISCUSSION

### a. State Law Claims

#### i. New Jersey Civil Rights Act Claims

Defendant moves for summary judgment as to Plaintiffs claims under the New Jersey Civil Rights ACT ("NJCA") on the basis that Plaintiff failed to serve notice upon the relevant public entity as required by the New Jersey Tort Claims Act, discussed below. Because it is well settled that the New Jersey Tort Claims Act does not apply to bar claims under the civil rights act, the Court declines to grant summary judgment as to Plaintiff's NJCA claim for lack of notice. *See Owens v. Feigin*, 194 N.J. 607, 613-614 (N.J. 2008).

## ii. Tort Claims of Trespass and Invasion of Privacy

Plaintiff brings two tort claims under New Jersey law: trespass and invasion of privacy. The New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. § 59:1-1 et seq., governs tort claims brought against public entities in the state. "To bring an action in tort against a 'public entity or public employee' in New Jersey, the claimant must file a notice of claim with the entity within ninety days of the accrual of the claim or else be 'forever barred' from asserting that cause of action." *Cnty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 174 (3d Cir. 2006) (quoting N.J. Stat. § 59:8-3 and -8). The NJTCA provides: "No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J. Stat. § 59:8-3. Notice is required so that the public entity can engage in administrative review, settle meritorious claims, and adequately investigate to prepare a defense. Id. § 59:8-4 cmt. (a)-(b). Section 59:8-3 sets forth the required contents of the notice, § 59:8-6 sets forth additional notice requirements, and § 59:8-7 sets forth the locations at which the claims must be filed. Section 59:8-8 sets forth the timing requirements.

Plaintiff does not dispute that it did not file a notice of tort claims in the instant matter; rather, it alleges that Defendants waived a defense premised on the NJTA notice requirement. (*See* CM/ECF No. 118, p. 1.) The Court disagrees. Defendants did not waive this defense because they specifically plead the notice requirements of the NJTA as an affirmative defense. (CM/ECF No. 6 at ¶ 19). Plaintiff's reliance on *Hill v. Board of Education* is off base. There, referencing the rule that a defendant must plead the notice requirement defense with specificity, the Court stated, "Defendant failed to comply with this rule since its affirmative defense did not set forth a statement of facts sufficient to show that it was the notice provisions of the Tort

Claims Act with which plaintiffs had not complied and which therefore acted as a bar to suit." *Hill v. Board of Education*, 183 N.J. Super. 36, 41 (App. Div. 1982). In the instant matter, Defendants pleaded this defense with specificity and the notice requirement serves to bar Plaintiff's tort claims. Accordingly, the Court grants summary judgment as to Plaintiff's state law tort claims of trespass and invasion of privacy.

b. Section 1983 Claims

Plaintiff brings several claims pursuant to 42 U.S.C. § 1983. Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To recover under § 1983, a plaintiff must show two elements: (1) the defendants acted under color of state law, and (2) their actions deprived the plaintiff of a right secured by the Constitution or federal statutes. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Since Defendant does not dispute that the conduct at the root of Plaintiff's constitutional claims constituted state action, the Court's opinion will focus on the second prong of the inquiry.

i. Trespass and Invasion of Privacy Under the Fourth or Fourteenth Amendments

Plaintiff brings separate claims for trespass and invasion of privacy under the Fourth and Fourteenth Amendments, in addition to its unreasonable search and seizure and due process claims. Trespass and invasion of privacy are common law torts. "Traditional common law causes of action, standing alone, are not actionable under § 1983." *Adelung v. Township of Jackson*, 1982 U.S. Dist. LEXIS 18173, at *20-21 (D.N.J. Oct. 18, 1982) (citing *Paul v. Davis*,

424 U.S. 693, 712-13 (1976)). "[T]he Fourteenth Amendment [is not] a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul*, 424 U.S. at 701; *see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 393-394 (1971) (explaining that state laws regulating trespass and invasion of privacy and the Fourth Amendment's "guarantee against unreasonable searches and seizures[ ] may be inconsistent or even hostile"). To the extent that Plaintiff believes that its asserted trespass and privacy claims go beyond the common law, and are based upon the same grounds as Plaintiff's unreasonable search and seizure and due process claims, the Court will address those claims below.

ii.     Fourteenth Amendment Due Process Claim

The Court now turns to whether Plaintiff can survive summary judgment as to the alleged deprivation of its Fourteenth Amendment rights. Neither the Complaint nor Plaintiff's response to Defendant's motion for summary judgment specifies whether Plaintiff is alleging a violation of its substantive or procedural due process rights. Therefore, the Court will address both claims in turn.

1.     Substantive Due Process

The due process clause of the Fourteenth Amendment protects an individual from arbitrary government action. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). A substantive due process violation is the deprivation of a protected interest involving an abuse of official power that "shocks the conscience." *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 399 (3d Cir. 2003). Thus, to succeed on a "substantive due process claim, Plaintiff must (1) allege and substantiate a property interest protected by due process, and

(2) prove that the government's deprivation of that property interest shocks the conscience." *Cherry Hill Towers, L.L.C. v. Township of Cherry Hill*, 407 F. Supp. 2d 648, 654 (D.N.J. 2006).

In the context of a violation of substantive due process, the property interest at issue must be of a "particular quality." *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir. 1995). The determination of whether a particular property interest constitutes this "particular quality" depends on whether the interest is "fundamental" under the Constitution. *See, e.g., id.*

Plaintiff states that the property interest at issue is Plaintiff's interest in its business certificate, also possibly construed as Plaintiff's right to engage in business. The Third Circuit has been hesitant to extend the protections of substantive due process beyond the realm of real property, however, and has previously held that the right to engage in business is not fundamental under the Constitution. *See Wrench Transp. Sys. v. Bradley*, 340 Fed. App'x. 812, 815-16 (3d Cir. 2009); *see also Nicholas v. Pa. State. Univ.*, 227 F.3d 133, 141 (3d Cir. 2000). This Court finds that there is no meaningful distinction between the right to engage in business and the right to a business certificate, and Plaintiff does not set forth any such distinction. Therefore, the Court finds that Plaintiff has failed to meet its burden of demonstrating that its right to a business certificate, much like the right to engage in business or make a living, is fundamental. *See Wrench*, 340 Fed App'x at 816; *see also, e.g., Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) (stating that the "right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes").

## 2. Procedural Due Process

Procedural due process involves notice and the right to be heard before any significant deprivation of a protected property right. *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). To state such a claim under § 1983, "a plaintiff must allege that (1) he was deprived of an

individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "The deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of the law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

The Third Circuit has explained that to "'establish a cause of action for a violation of Procedural Due Process, a plaintiff [must prove] that a person acting under color of state law deprived [him] of a protected interest [and] that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process.'" *H&R Grenville Fine Dining, Inc. v. Borough of Bay Head*, 2011 U.S. Dist. LEXIS 145447, at *54 (D.N.J. Dec. 19, 2011) (quoting *Midnight Sessions, Ltd., v. City of Philadelphia*, 945 F.2d 667, 680 (3d Cir. 1991)). "Thus, in the present context, the Court must determine: (1) whether there is a liberty or property interest that has been interfered with by Defendants, and, if so: (2) whether the 'procedures attendant upon that deprivation were constitutionally sufficient.'" *H&R Grenville Fine Dining, Inc.*, 2011 U.S. Dist. LEXIS 145447, at *54 (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

The Court finds that a business license is a property interest worthy of procedural due process protection.[8] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood."). Once issued, a license or permit "may become essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539 (1971); *see also, e.g., H&R Grenville Fine Dining, Inc.*, 2011 U.S. Dist.

---

[8] To the extent Plaintiff is also alleging a violation of procedural due process regarding the forfeiture of its property, the Court finds that Plaintiff does not have standing to bring such a claim, discussed below.

22

LEXIS 145447, at *56 (finding a liquor license to be a property interest); *Sea Girt Restaurant &* *Tavern Owners Asso., v. Borough of Sea Girt, New Jersey,* 625 F. Supp. 1482, 1488 (D.N.J. 1986) (same); *Spinelli v. New York,* 579 F.3d 160, 169 (2d Cir. 2009) (holding business license, once granted, to be property interest for purposes of procedural due process); *Wells Fargo* *Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n,* 547 F.2d 938, 941 (5th Cir. 1977) ("[P]rivileges, licenses, certificates, and franchises... qualify as property interests for purposes of procedural due process.").

Plaintiff alleges that the closures of its business and revocations of its business certificate without notice and a pre-deprivation hearing violated due process. Defendants rely on several Third Circuit cases to allege that the post-deprivation remedies available to Plaintiff after the revocation of its business license were sufficient to comply with due process. Underlying Defendants' argument is the premise that a state "provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *DeBlasio,* 53 F.3d at 597. Thus, "when a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process...whether or not the plaintiff avails him or herself of the provided appeal mechanism." *Id.* (citations and internal quotations omitted). Defendants detail the various appellate mechanisms available to Plaintiff after the revocations of its license to demonstrate that full judicial mechanisms were in place to allow Plaintiff to challenge the administrative decision at issue. *See, e.g., Midnight Sessions,* 945 F.2d at 680 (finding that a full judicial mechanism was available and thus rejecting a procedural due process challenge); *MFS,* *Inc. v. Dilazaro,* 771 F. Supp. 2d 382 (E.D. Pa. 2011).

Defendants ignore a key distinguishing fact between the cases it cites and the one at hand. *Midnight Sessions*, *DiBlasio,* and progeny analyzed the appellate mechanisms available to those *denied* certain land use permits by administrative bodies; the Court in each case found no due process violations when a state "affords a full judicial mechanism with which to challenge the administrative decision to deny an application for a...permit." *Bello v. Walker*, 840 F.2d at 1128; *see also DiBlasio*, 53 F.3d at 597 (state provided adequate procedure for challenging adverse zoning provisions); *Midnight Sessions*, 945 F.2d at 680 (finding due process in appellate avenues available subsequent to the denial of a dance license). In the instant matter, Plaintiff had already been granted a business certificate. To be sure, the due process requirements attendant upon the denial of an application for a property right *not yet granted* where an appellate process was available but the plaintiff did not take advantage of it, on the one hand, and the revocation of a *previously granted* certificate without notice or a pre-deprivation hearing, on the other, require a different analysis.

To determine whether a pre-deprivation hearing is required to afford due process, a court must balance the factors set forth in *Matthews v. Eldridge*, which are "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used," "the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 334-35 (1976). Since Defendants do not address how the *Matthews v. Eldridge* factors would apply in the face of a previously granted property interest or include convincing analysis as to why the normal notice and pre-deprivation hearing requirements of due process

would not have been necessary in this instance, the Court finds that Defendants have failed to meet their burden on the procedural due process claim.

The Court now turns to whether the municipality or Lt. Anari individually can be held liable for any violations of procedural due process under § 1983.

### a. Municipal Liability

"Claims against individual officials [like Lt. Anari] in their official capacity are the equivalent of a claim against the municipality that employs him [sic]." *Okocci v. Klein*, 270 F. Supp. 2d 603, 613 (E.D. Pa. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Thus, to the extent that Plaintiff has asserted a municipal liability claim against Lt. Anari, the Court construes said claim as brought only against the Borough of Fairview. *See Okocci v. Klein*, 270 F. Supp. 2d at 613.

It is well settled that "a municipality may be held liable under a § 1983 action only in limited circumstances." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 688-89 (1978). Specifically, a municipality "may not be held liable under § 1983 for the constitutional torts of its employees by virtue of respondeat superior." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006). Rather, "a municipality may be held liable for the conduct of an individual employee or officer only when that conduct implements an official policy or practice." *Id.* (citing *Monell*, 436 U.S. at 690). Thus, to prevail on a § 1983 claim against Fairview, Plaintiff "must prove the existence of a policy or custom that has resulted in a constitutional violation in order to make . . . [Fairview] liable under § 1983." *See Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (citing *Monell*, 436 U.S. at 694-95). Additionally, Plaintiff must establish "a plausible nexus or affirmative link between . . . [Fairview's] custom [or policy] and

the specific deprivation of constitutional rights at issue." *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks omitted).

Plaintiff puts forward no argument as to why Fairview should be held liable for any potential violations of procedural due process. Plaintiff points to no policy or custom of revoking business certificates or closing businesses without due process of law. Plaintiff also does not argue that the city should be held liable for procedural due process violations based on a failure to train theory. "A § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991). In light of this, the Court finds that the municipal defendants cannot be held liable for any potential violations of procedural due process attendant upon the revocation of Plaintiff's business license or closure of its business.

b. Individual Liability of Lt. Anari

Section 1983 provides a cause of action to any person who has been deprived of their federal rights by a person acting under color of state law. However, "[w]hen an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit." *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). "Qualified immunity is a complete immunity from suit . . . ." *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009). Under this doctrine, "[g]overnment officials performing discretionary functions are immune 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). The appropriate inquiry is two-pronged and asks (1) whether the official's conduct violated a constitutional right, and (2) whether that right was clearly established such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Lamont*, 637 F.3d at 182. Because police officers in the field must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Saucier v. Katz*, 533 U.S. 194, 205 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009), they are entitled to some leeway for the decisions they make. *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). In short, qualified immunity excuses an officer's reasonable mistake as to what the law requires. *Saucier*, 533 U.S. at 206. "'If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized.'" *Giles*, 571 F.3d at 325 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because material issues of fact remain as to the nature of the procedural due process violations, if any, that occurred at the direction of Lt. Anari, the Court declines to grant qualified immunity to Lt. Anari for his actions related to the license revocations and business shut-downs at this time. There are disputed issues of fact as to who was responsible for each of the revocations and closures and whether some of the closures were consensual. On at least one occasion, Defendants claim the closure was "voluntary" while Plaintiffs assert that Lt. Anari forcibly shut down its business. (Def. SUMF ¶¶ 50-53; Pl. Opp. SUMF ¶¶ 50-53.) On another, Defendants claim that the decision to shut down the premises was entirely that of the Building Department official while Plaintiff claims that Lt. Anari was again ultimately responsible for the closure. (Pl. Supp. SUMF ¶1(f); Def. Resp. SUMF ¶ 1(f).) While the Court is mindful of the Supreme Court's instruction that decisions on qualified immunity should be determined as early

as possible in litigation, the Court finds that issues of fact remain that affect both the determination of whether Lt. Anari was responsible for the closures and license revocations and, if so, whether he violated clearly established law. *See Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) ("Because qualified immunity bestows immunity from suit, the Supreme Court 'repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'") (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)); *but see, e.g., Giles*, 571 F.3d at 327 n.4 ("Denying summary judgment on the basis of [a] factual dispute...is not...improper."); *Manasco v. Rogers*, 337 Fed. App'x. 145 (3d Cir. 2009) (declining to grant qualified immunity on summary judgment due to issues of fact).

### iii. Fourth Amendment Illegal Search and Seizure Claims

#### a. Res Judicata and Standing

Plaintiff and Defendants each move for summary judgment on Plaintiff's illegal search and seizure claims. Plaintiff moves for summary judgment on its Fourth Amendment claim as it relates to Defendants' 2008 search of its premises only. Defendants move for summary judgment as to Plaintiff's Fourth Amendment claims arising out of all searches at issue.

As a preliminary matter, Defendants allege that Plaintiff's claims for damages based upon the January 17, 2008 search and seizure are barred by res judicata and New Jersey's entire controversy doctrine.[9] The Court disagrees. The prior forfeiture action was *in rem* and "[t]he effect of a judgment [in rem or quasi in rem]...is limited to the property that supports jurisdiction...." *Shaffer v. Heitner*, 433 U.S. 186 (1977). In addition, "[r]es judicata generally applies to parties in privity with those named in a prior action." *See Abulkhair v. Page-Hawkins*, 448 Fed. App'x. 291, 293 (3d Cir. 2011). Lt. Anari in his individual capacity was not a party to

---

[9] The Entire Controversy Rule is embodied in New Jersey Rule of Court 4:30A and provides that "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine."

the forfeiture. *See Id.* (stating that while defendant might have been in privity with the state in her official capacity, res judicata and the entire controversy doctrine would not apply to bar claims against her in her individual capacity) (citing *Gregory v. Chehi*, 843 F.2d 111, 120-21 (3d Cir. 1988)). Moreover, "the entire controversy doctrine requires the joinder of related claims but not related parties." See *Abulkhair*, 448 Fed. App'x. at 293 (citing *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 n.1 (3d Cir. 1999)). Neither the entire controversy doctrine nor res judicata bars subsequent claims tied to the 2008 search.

However, the Court finds that Plaintiff waived its interest in the seized property when it withdrew its answer to the forfeiture complaint and agreed to default judgment. Plaintiff's voluntary withdrawal stated that it "waive[d] any and all claims to the return of the Defendant property and consent[ed] to the entry of a Default Judgment against said Defendant property." (Def. SUMF Exhibit RR.) As a result, Plaintiff lacks standing to contest the *seizure* of said property. *See United States v. Raspino*, 295 Fed. App'x. 486 (3d Cir. 2008) (finding that plaintiff lacked standing to challenge the District Court's forfeiture order because the order determined her interest in the property and she failed to appeal); *United States v. Pelullo*, 178 F.3d 196, 202 (3d Cir. 1999) (noting that "a forfeiture order entered at sentencing conclusively determines all of the defendant's interest in the forfeited property and is final for purposes of appeal."). The Court declines to wade into the implications of this finding on the issue of the amount of damages that may ultimately be appropriate at this time, and will now address the propriety of the 2007 and 2008 searches.

b. Propriety of the Searches

Plaintiff alleges that Defendants' warrantless searches of its premises violated the Fourth Amendment. In particular, Plaintiff alleges that on the following dates members of the Fairview

Police Department and Lt. Anari in particular conducted illegal searches of its premises: July 31, 2007 (stated in the Complaint as the "July 17, 2007" search, but the facts Plaintiff describes appear to be referencing the July 31, 2007 search); August 23, 2007; and January 17, 2008. (CM/ECF No. 1.) Because the Court finds that issues of material fact remain as to the scope of the January 17, 2008 search of the Ritz premises, it denies Plaintiff and Defendants' motions for summary judgment on Plaintiff's Fourth Amendment illegal search claims. The Court will address each incident in turn.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. It is well settled that "[w]arrantless searches [of areas in which there is a reasonable expectation of property]...are presumptively unreasonable and are therefore prohibited under the Fourth Amendment unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). Businesses have a lesser expectation of privacy in their commercial premises than do individuals in their homes because a "business operator has a reasonable expectation of privacy only in those areas from which the public has been excluded." *United States v. Dunn*, 480 U.S. 294, 316 (1987); *see also, e.g., Lewis v. United States*, 385 U.S. 206, 211 (1966). This "does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials," however. *Lewis*, 385 U.S. at 211. "The reasonableness of the expectation depends on such factors as whether [there is] a possessory or property interest in the premises," *United States v. Conley*, 813 F. Supp. 372, 377 (W.D. Pa. 1993), rev'd on other grounds, 4 F.3d 1200 (3d Cir. 1993), and "whether [the business] has taken the additional step of

barring the public from the area...." *United States v. Dunn*, 480 U.S. at 316. Moreover, that a business operating out of certain premises is of an illegal nature does not "negate the legitimate expectation of privacy..." therein. *United States v. Savage*, 2013 U.S. Dist. LEXIS 9360, at *15-16 (E.D. Pa. Jan. 23, 2013).

### 1. July 31 and August 23, 2007 Searches

A search conducted pursuant to voluntary consent does not violate the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Defendants allege that the search of Plaintiff's premises on July 31 was consensual. Plaintiff asserts that the July 31 search by the two officers who accompanied the health inspector on her inspection was "pretextual." (Pl. Supp. SUMF at ¶ 1(f).) Although the parties agree that on that date, Lt. Anari did not search the premises, Plaintiff alleges that he "had two officers conduct a pretextual search by accompanying the Bergen County Department of Health Services on its inspection the same date." (*Id.*) However, no criminal summonses were issued on July 31. (Def. SUMF at ¶ 42.) Moreover, the health inspector's report states that the officers accompanied her on the inspection because of "some dark areas" on the premises. (Def. SUMF Exhibit Z, General Inspection Report.) Plaintiff does not dispute that its attorney, Scott Finckenauer, accompanied the inspector and officers on the July 31 search, but claims that Finckenauer gave permission only to the health inspector to enter the premises. (Pl. Opp. SUMF at ¶ 38.) Plaintiff has submitted no evidence to rebut Defendants' assertions that the search by the health inspector and officers was consensual and that Lt. Anari did not accompany the inspector on her search. (*Id.* at ¶¶ 38-40.) Plaintiff has therefore failed to meet its burden of showing that there is a genuine issue of fact as to whether police impermissibly searched areas

from which the public was barred or in which it had a reasonable expectation of privacy on July 31, 2007.

Defendants also allege that the August 23, 2007 search was consensual. Plaintiff again disputes this, but points to no evidence that contradicts Lt. Anari's report or affidavit. In his narrative report, Lt. Anari wrote that, "[a]fter a ten minute wait [Steve Russo] called the attendant and said that it was ok for us to walk through." (Def. SUMF Exhibit GG, Narrative Report of Lt. Anari.) In his certification, Lt. Anari wrote that Russo "granted [him] permission to clear the building of any persons who had remained inside." (Def. SUMF Exhibit V, Certification of Lt. Anari.) Plaintiff denies that Lt. Anari received consent from Russo, but cites no record evidence in support of this contention. (Pl. Opp. SUMF at ¶ 53.)

The only evidence Plaintiff submits as proof that the searches on July 31 and August 23, 2007 were non-consensual is the certification of Joseph Urgo. (Pl. Supp. SUMF Exhibit A, Certification of Joseph Urgo.) Despite Plaintiff's acknowledgment that Urgo was not present at the Ritz on either occasion, Urgo's certification states that on July 31, 2007, despite being told that he could not search the premises by one of Plaintiff's lawyers, Lt. Anari "had two officers conduct a pretextual search." (*Id.* at ¶ 6.) As for the search on August 23, 2007, Urgo's certification states that Lt. Anari and other police officers searched Plaintiff's premises without a warrant, "unlawfully detained and questioned various employees," and "refused to leave despite being requested to do so." (*Id.* at ¶ 7.)

Federal Rule of Civil Procedure 56(c)(4) states that "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ." The Rule's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'" *Olivares v. United States*, 447 Fed. App'x. 347, 351 n.6 (3d Cir.

2011) (citing *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004)). The Third Circuit has explained:

> It is true that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. Pa. 2002). Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact. *Id.* (collecting cases); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985); see also FED. R. CIV. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.").

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009). Because Plaintiff's assertions that the July 31 and August 23, 2007 searches violated the Fourth Amendment are based on "conclusory, self-serving allegations" contained in an affidavit submitted by someone without personal knowledge of the events at issue, *id.*, the Court grants Defendant's motion for summary judgment as to Plaintiff's Fourth Amendment claims arising from the 2007 searches of the premises.[10]

## 2. January 17, 2008

Plaintiff and Defendants both move for summary judgment as to Plaintiff's claim that the officers' January 17, 2008 search of the Ritz violated the Fourth Amendment. Plaintiff alleges that officers impermissibly searched locked and private areas on the premises, including a costume closet, office, and locked room. Plaintiff points to the officers' comments as well as the loud banging noise captured by the surveillance video. Underlying Plaintiff's claim that the officers broke into locked areas are loud bangs heard on the surveillance footage and officers' discussions related to locked areas. (Pl. SUMF ¶ 17a-17y.) Plaintiff claims that the bangs heard

---

[10] To the extent Plaintiff also claims that the search on July 8, 2007 violated the Fourth Amendment, the Court disagrees. Lt. Anari's police report and certification state that he obtained the consent of Plaintiff's registered corporate agent and attorney, Scott Finckenauer, to enter the premises occupied by the Ritz and was shown around by another employee. (Def. SUMF ¶ 30.) Again, the only evidence Plaintiff provides to dispute that consent was given is Urgo's certification. (Pl. Opp. SUMF ¶ 30.)

on the video were the noises that resulted from officers trying to break into locked areas of the premises. (Pl. SUMF at ¶ 17.) Plaintiff also highlights several comments made by officers at the scene. For example, when the first set of banging occurs, Lt. Anari can be heard referencing the noise and saying that the officers did not need a warrant. (Def. SUMF Exhibit KK at 1:59.) At another point in the video, the officers can be heard discussing keys for one or more locked areas with the female employees. (*Id.* at 2:08.) Lt. Anari was involved in this discussion. (*Id.*) One officer can be heard saying that it was "too late," possibly referencing using a key to open something and implying that it was "too late" because officers broke in already. (*Id.*) Later, an officer, not Lt. Anari, can be heard asking about the costume closet and saying something about a key. (*Id.* at 2:13.) Some officers again discuss a costume closet and a closet for cleaning supplies later in the video, but the rest of their statements are inaudible. (*Id.* at 2:42.)

Defendants dispute that officers searched any locked or private areas. Defendants specifically deny that officers broke into any private offices on the premises. (Def. SUMF ¶ 77; Def. SUMF Exhibit NN, Architectural Plans for the Ritz.) Although Plaintiff disputes this contention, Plaintiff does not contest the accuracy of the blueprint provided by the Defendants. As such, it is clear to the Court from the surveillance footage and blueprint of the premises that no officer entered an office located directly adjacent to the front reception area.

As for the banging noises, Defendants claim that one set of bangs occurred prior to officers finding a second female employee, Jessica Srygley, naked with a male customer in a room. (Def. SUMF at ¶ 78.) Defendants imply that the bangs were the result of officers trying to open the room where this female was discovered. Defendants claim that the second set of bangs heard on the video was the result of officers removing a safe from its floor bolts. (*Id.* at ¶¶

87, 95.)[11] The safe remains unopened. (*Id.*) Lt. Anari stated while on the scene that the officers would be able to take the safe for forfeiture but "to open it, [they would] need a warrant." (*Id.* at ¶¶ 88; Def. SUMF Exhibit KK, Surveillance Video at 2:47.) Although Defendants have demonstrated that officers did not break into to any front offices and did not open the safe, they have failed to convince the Court that no genuine issues of fact remain as to whether officers broke into the costume closet or other locked areas of the premises.

Defendants claim that even if the officers searched locked or private areas, their actions were justified by one or more exceptions to the warrant requirement and summary judgment should be granted in their favor. Defendants allege that such a search would have been justified because (1) Plaintiff did not have a reasonable expectation of privacy in its premises; (2) the officers' search fell within the bounds of a search incident to the arrests of Plaintiff's employees; (3) the search was conducted for the purpose of a protective sweep; and (4) "the search was conducted for the protection of vulnerable persons who may have been present at The Ritz Spa during its normal operating hours." (CM/ECF No. 114, p. 53.) The Court declines to grant summary judgment on Plaintiff's Fourth Amendment claim, however, as Defendants provide scant support for these arguments and the Court disagrees that the officers' search of private areas would necessarily be justified by a recognized exception to the warrant requirement.

First, Defendants claim that Plaintiff did not have a reasonable expectation of privacy in its premises. Defendants correctly state that businesses enjoy a lesser expectation of privacy in their premises than do individuals in their homes. This is because businesses are open to the public and law enforcement officers, being members of the public, may enter those areas without

---

[11] Plaintiff cites Exhibit E, photographs of its premises after the search, as evidence that officers broke into locked areas. (Pl. SUMF at ¶ 9.) Defendants object to the inclusion of such photographs in the record. (Def. Opp. SUMF at ¶ 9.) The Court notes that it did not receive the photographs at issue. As such, they will not be considered for the purpose of this motion.

a warrant. *See, e.g. Lewis*, 385 U.S. at 211. What Defendants miss is that businesses maintain an expectation of privacy in those areas *closed* to the public. *See id.* "A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials." *Id.* Thus, Defendants have not demonstrated that Plaintiff lacked a reasonable expectation of privacy in locked areas closed to the public.

Defendants make two related arguments: there is no expectation of privacy in premises used to conduct illegal activity and Plaintiff lacked any expectation of privacy in premises it did not validly possess. The first, that Plaintiff has no reasonable expectation of privacy in premises used to conduct illegal activity, is plainly incorrect. In support of this notion, Defendants cite *Lewis*. (EM/ECF 114, p. 30.) As described above, the *Lewis* Court did not find that defendants had no expectation of privacy in premises used to conduct illegal activity; rather, the Court found that the zone of privacy did not extend into areas into which an officer was *invited* for the purpose of conducting illegal activity. *See Lewis*, 385 U.S. at 211. Because that area was open to customers and the undercover officer was invited in as a customer, the defendant in *Lewis* could not claim an expectation of privacy in that area of his home. *See id.* Defendants have failed to demonstrate that Plaintiff lacked a reasonable expectation of privacy in those areas into which customers were allegedly *not* invited for business purposes.

Defendants related claim, that Plaintiff lacked a reasonable expectation of privacy in premises it did not validly possess, is unsupported. For this premise, Defendants cite *Rakas v. Illinois*, 439 U.S. 128 (1978). The *Rakas* Court found that a person with "neither a property nor

a possessory interest in the [property searched], nor an interest in the property seized" lacks standing to contest the search of that property. *Id.* at 148 ("[T]he fact that [someone was] legitimately on the premises in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched.") (internal quotations and citations omitted). This premise is easily distinguishable from the case at hand, in which there is no indication that Plaintiff occupied the premises without the permission of the landlord or otherwise lacked a reasonable expectation of privacy in certain areas therein.

Second, Defendants allege that any search of private areas was justified incident to the arrests of Plaintiff's employees. Searches incident to arrest are for the purpose of protecting the arresting officers and where it is reasonable to believe that evidence relevant to the crime of arrest may be found. *Arizona v. Gant*, 556 U.S. 332 (2009). The scope of such a search is limited to "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence," *Chimel v. California*, 395 U.S. 752, 763 (1969). Issues of fact remain as to whether the scope of the officers' search exceeded a proper search incident to arrest.

Third, Defendants claim that if officers searched private areas, it was to conduct a protective sweep of the premises. In support of this argument, Defendants cite to *State v. Lane*, a New Jersey state case that extended the protective sweep doctrine beyond searches incident to arrest. *See State v. Lane*, 393 N.J. Super. 132, 153 (App. Div. 2007). But with this citation Defendants miss the key factor underlying proper protective sweeps. The Court in *Lane* stated, "we agree with the logic of those federal decisions that have determined that the validity of the warrantless sweep...turns...on the officer's right to be in a location that generates a *reasonable*

*articulable suspicion that the area to be swept 'harbors an individual posing a danger' to those on the scene."* *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 337 (1990)) (emphasis added).

The Fifth Circuit has summarized three variations of justifiable protective sweeps:

> First, incident to an arrest, law enforcement officers may contemporaneously search areas within the arrestee's immediate control to prevent the destruction of evidence or procurement of a weapon. Second, officers may search areas immediately adjoining the place of arrest, such as closets and other spaces, from which a surprise attack could occur. Probable cause or reasonable suspicion is not necessary for these first two variations. Third, officers may also perform cursory protective sweeps of larger areas if they have articulable facts plus rational inferences that allow a reasonable officer to suspect that an individual dangerous to the officers is within the area to be searched.

*United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008) (internal quotations omitted). In the instant matter, material issues of fact remain as to whether the scope of the search exceeded those areas immediately adjoining those rooms where the arrest took place, and as to whether the officers had reason to believe that any private areas they searched housed an individual posing danger to those on the scene.

Defendants also allege that Plaintiff failed "to identif[y] specifically which private areas had been invaded where officers would not have been permitted to search for purposes of inventorying items for forfeiture." (CM/ECF 114, p. 48.) Defendants cite *United States v. Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985), for the proposition that because Plaintiff failed to identify any areas the officers were not permitted to search to inventory items for forfeiture, Plaintiff's Fourth Amendment claim must fail. (CM/ECF 114, p. 48.) Defendants' reliance on *Castellano* is misleading, however. In *Castellano*, the officers entered a spa pursuant to a forfeiture complaint and judicial forfeiture order based on a finding that there was probable cause to believe the spa "was being operated, on a continuing basis, as a house of prostitution." 610 F. Supp. at 1436. In the instant matter, the issue is whether the officers could search certain areas for forfeiture *without* judicial process and a forfeiture order.

Since genuine issues of material fact exist as to whether officers broke into locked areas of the Ritz premises, and, if so, which areas they broke into and what their justifications were for entering private spaces, the Court denies both motions for summary judgment on the Fourth Amendment illegal search claim arising out of the January 17, 2008 incident.

The Court now turns to whether the municipality or Lt. Anari individually can be held liable for any violations of the Fourth Amendment under § 1983.

### a. Municipal Liability for the Fourth Amendment Claim

Plaintiff claims that the municipal defendants should be held liable for the alleged Fourth Amendment violation because "through [the Borough's] failure to train its officers and the repeated illegal closures of [Plaintiff's] business, the Township of Fairview has exhibited a deliberate indifference to the rights of its inhabitants in regard to their Fourth Amendment Rights...." (CM/ECF No. 118, p. 6.) Thus, Plaintiff's argument that the municipal defendants should be held liable is premised on two theories: (1) the maintenance of an unconstitutional policy, custom, or practice; and (2) Fairview's alleged failure to train Lt. Anari on search and seizure laws and practices. (*Id.* at p. 2.) Defendants assert that summary judgment should be granted in their favor on Plaintiff's Fourth Amendment claims with respect to the municipal defendants because Plaintiff has not "identified any official policy, practice or custom adopted or implemented by the Borough as supportive of its claims" and has not "identified the specific training it contends would have avoided the alleged violation...." (CM/ECF No. 114, pp. 20, 25.)

*Monell* held that a municipality can be sued under § 1983 only if the official conduct that caused the plaintiff's injury was the result of the municipality's policy or custom. 436 U.S. at 690. A policy is defined as a "policy statement, ordinance, regulation, or decision officially

adopted and promulgated by" the municipality, *id.*, while a custom is defined as a course of conduct that, while not officially adopted, is so permanent and well settled "'as to virtually constitute law.'" *Hansell v. City of Atlantic City*, 152 F. Supp. 2d 589, 609 (D.N.J. 2001) (quoting *Andrews*, 895 F. 2d at 1480). In addition to establishing the existence of a policy or custom, a plaintiff must establish a causal connection between the policy or custom and the injury suffered. *Talbert v. Kelly*, 799 F.2d 62, 67 (3d Cir. 1986). "[A] single incident of police misbehavior by a single policeman is insufficient as sole support for an inference that a municipal policy or custom caused the incident." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985).

Plaintiff points to no official policy that would give rise to *Monell* liability. Instead, Plaintiff states, "The Borough of Fairview, through its police department and building department, engaged in a series of unlawful closures, searches, summonses and patterns of harassment of the Plaintiff's lawful business" and through this custom demonstrated deliberate indifference to its constitutional rights. (CM/ECF No. 118, p. 2, 6.) To succeed on a claim, however, a plaintiff must demonstrate that the practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691.

Plaintiff's allegations in the instant matter fall short of the burden set forth in *Monell. See id.* at 690-91. Plaintiff does not provide any evidence of a "permanent and well settled" custom of illegally searching business premises. *See id.* at 691. Further, under a theory of deliberate indifference, "[P]laintiff must ' simply establish a municipal custom coupled with causation— i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [its] injury.'" *See Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996) (quoting *Bielevicz*, 915 F.2d at

851). As discussed above, Plaintiff has not established any prior illegal searches that would constitute a custom or policy of illegally searching business premises and that would have put policymakers on notice of the alleged violations. Accordingly, the Borough cannot be held liable for a custom or practice exhibiting deliberate indifference to Plaintiff's Fourth Amendment rights.

To establish § 1983 liability for failure to train, a plaintiff must show specific training deficiencies and either (1) a pattern of constitutional violations of which policy-making officials can be charged with knowledge, or (2) that training is obviously necessary to avoid constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). A municipality may be held liable for its failure to train employees only where that failure amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." *Id.*, at 388. There are two means of finding such deliberate indifference in a failure to train claim: (1) through a pattern of similar constitutional violations providing a municipal actor with notice; and (2) "single-incident" liability as developed doctrinally in the Supreme Court's decisions in *City of Canton v. Harris* and *Connick v. Thompson*.

In general, a plaintiff must establish deliberate indifference in accordance with the first means—a pattern of similar constitutional violations—in order to establish a failure to train claim: "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (citing *Bryan Cnty.*, 520 U.S. at 409). In the instant matter, as explained above, Plaintiff has put forth no evidence demonstrating

41

that Fairview was "on actual or constructive notice that a particular omission in [its] training program cause[d] city employees to violate citizens' constitutional rights," and thus that the Borough can be found to have been "deliberately indifferent...by choos[ing] to retain that program." *Connick*, 131 S. Ct. at 1360.

In "'a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference. . . . [For] example [if] a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick*, 131 S. Ct. at 1361 (citing *Canton*, 489 U.S. at 390 n. 10). In such circumstances, deliberate indifference may be established through "single-incident" liability. *Id.* To show deliberate indifference in this narrow range of circumstances, a plaintiff would have to show that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Canton*, 489 U.S. at 390.

The Court finds that Plaintiff fails to allege liability for the Borough's failure to train Lt. Anari since it fails to state facts supporting their deliberate indifference based on a "single-incident" liability theory. Plaintiff cites to no facts detailing specific deficiencies in training programs provided by the police department. Plaintiff points out that the Borough had no written policies as to a supervisor's role in executing a search warrant, that Lt. Anari misunderstood the warrant requirements pursuant to seizing property for forfeiture, that Lt. Anari's deposition

testimony revealed that it might not have he known what an administrative search warrant was, and that Lt. Anari could not recall any search and seizure training outside of the police academy. (CM/ECF No. 118, p. 2.)

It is insufficient for Plaintiff to allege that an injury could have been avoided if the Borough had been provided more or better training. As the Court in *Connick* stated, "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. '[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" will not suffice." 131 S.Ct. 1363-64 (citing *Canton*, 489 U.S. at 391) (bracketed language in original). Given that a municipality's culpability for a deprivation of rights "is at its most tenuous where a claim turns on a failure to train," this Court finds that, given the limited factual support for Plaintiffs' failure to train claim, it cannot survive a motion summary judgment. *See Gaymon v. Esposito*, 2013 U.S. Dist. LEXIS 116159, at *52 (D.N.J. Aug. 16, 2013) (finding allegation of failure to train inadequate where "the nature of the deficiencies of said program, for example in light of comparators such as training given by other municipalities or counties...or recognized standards for training police officers in such areas"); *Connick*, 131 S. Ct. 1350, 1359 (citing *Oklahoma City*, 471 U.S. at 822-23) (plurality opinion) (" [A] 'policy' of 'inadequate training;'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell."). For the foregoing reasons, the Court finds municipal liability inappropriate for Plaintiff's Fourth Amendment claim.

### b. Lt. Anari's Individual Liability

Defendants assert Lt. Anari should be granted qualified immunity from suit on Plaintiff's illegal search claim because he himself did not break into any locked or private areas of the

premises and did not direct others to do so. Even if he did not himself break into locked areas of the Ritz premises, Lt. Anari, as a supervisor of the operation, may be personally liable under § 1983 if he participated in violating the Plaintiff's rights or directed others to violate them. *A.M.*, 372 F.3d at 586; *see also Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990) (reversing denial of summary judgment as to Chief of Police in his individual capacity where "Plaintiff . . . supplied no evidence [that he] . . . directed or affirmatively participated in any of the actions claimed to have deprived Evans of her constitutional rights and, ultimately, her life."). "A defendant who supervised a malfeasor but did not actually inflict the malfeasance is not liable under § 1983 on a theory of respondeat superior unless he personally directed in the deprivation." *Young v. Beard*, 2009 U.S. Dist. LEXIS 87249, at *10 (M.D. Pa. May 29, 2009) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[P]urpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.")

As explained above, while the Court is mindful of the Supreme Court's instruction that decisions on qualified immunity should be determined as early as possible in litigation, the Court finds that issues of fact remain that affect both the determination of whether the officers broke into locked and private areas and thereby violated clearly established law, and whether Lt. Anari possessed the requisite purpose required to hold him responsible for any violations. *See, e.g.*, *Giles*, 571 F.3d at ("Denying summary judgment on the basis of [a] factual dispute...is not...improper."). There is also an issue of fact as to whether Lt. Anari relied on advice from the Bergen County Prosecutor in conducting the search. (Def. SUMF ¶ 80; CM/ECF No. 144, p. 69.) Because questions of material fact remain as to whether Lt. Anari violated clearly

established Fourth Amendment law and as to whether he can be held liable for any such violations, the Court declines to grant qualified immunity to Lt. Anari at this time.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to: (1) Plaintiff's claims for invasion of privacy and trespass under New Jersey law; (2) all of Plaintiff's municipal liability claims; and (3) Plaintiff's illegal seizure claims. Defendants' motion is denied as to: (1) Plaintiff's procedural due process claim against Lt. Anari; and (2) Plaintiff's illegal search claims against Lt. Anari stemming from the January 17, 2008 search under the Fourth Amendment and New Jersey Civil Rights Law. Plaintiff's motion for summary judgment is denied. An appropriate order follows.


Dated: 1st of November, 2013.


_/s/Jose Linares_____
JOSE L. LINARES
U.S. DISTRICT JUDGE